UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:21-cr-343 SDM-AAS

DE ANNA MARIE STINSON

### UNITED STATES' RESPONSE IN OPPOSITION TO STINSON'S MOTION FOR COMPASSIONATE RELEASE

The United States opposes De Anna Marie Stinson's motion for compassionate release. Doc. 77. Stinson has not exhausted her administrative remedies, no extraordinary and compelling circumstances exist, and, in any event, she represents a danger to the community and the 18 U.S.C. § 3553(a) factors do not support her early release from incarceration.

## I.    BACKGROUND

On April 21, 2022, this Court sentenced Stinson to serve 78 months' imprisonment after she pleaded guilty to murder for hire. Doc. 62. In the summer of 2021, Stinson created an account on a dark web website ("The Website") for the purpose of hiring a hitman to kill the spouse of her former significant other. Doc. 39 at 2. The sole purpose of The Website is to advertise murder-for-hire services. *Id.* The FBI obtained records associated with Stinson's account on The Website. *Id.* According to the records, Stinson created an account on or about June 24, 2021. *Id.* One day after creating her account, on or about June 25, 2021, Stinson placed her first "order" for hitman services, which included Victim 1's name, address, and a photograph of Victim

1.[1] Doc. 60 (PSR) ¶ 10. The order also included a description that read, "Do not do at the home.   Any place else is fine.   Need completed during July – preferably, between July 5th – 11th." *Id.* In addition to the "order" described above, Stinson placed four additional orders between on or about July 15, 2021, and on or about July 22, 2021, seeking to hire a hitman to kill Victim 1. *Id.* Like the first order, the four subsequent orders also included the name, address, and a photograph of Victim 1. *Id.* In total, Stinson paid The Website approximately $12,307.61 in Bitcoin to solicit and hire a hitman to kill Victim 1. *Id.*

In addition to placing multiple "orders", Stinson continuously reached out to the administrator of The Website and the purported hitmen to follow up on the status of her requests. PSR ¶¶ 12, 13. On or about July 31, 2021, Stinson requested that the "job" be reassigned "to someone who has a history of getting jobs done." *Id.* ¶ 12.

On or about August 27, 2021, Stinson communicated via text message with an undercover FBI agent purporting to be a hitman from The Website. PSR ¶ 14. Stinson confirmed the identity of Victim 1 via a photograph, indicating Victim 1 was the person she sought to have killed. *Id.* During a recorded phone call a few days later, the undercover agent spoke with Stinson *Id.* During the call, the undercover agent explained that he would need to purchase a gun to commit the murder and that it would cost Stinson an extra $350 to be sent via Western Union. *Id.* Stinson agreed to pay the money

---

[1] Paragraph 10 of the PSR inaccurately describes the first "order" as occurring on July 25, 2021.

but stated, "I can't send you Western Union, I don't want it traced." *Id.* Stinson then paid the undercover agent the money for the gun via Bitcoin and was ultimately arrested. *Id.* ¶ 15.

Stinson has no prior criminal history, *id.* ¶ 36, nor does she suffer from any mental health or substance abuse concerns, *id.* ¶ 51.

Stinson is incarcerated at FCI Tallahassee in Tallahassee, Florida, is 51 years old, and is projected to be released on January 8, 2027. *See* Bureau of Prisons (BOP) Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on March 27, 2023). Stinson has served approximately 18 months of her 78-month sentence.[2] The BOP has not documented any disciplinary issues. *See* Exhibit A.

## II.   MEMORANDUM OF LAW

A district court has no inherent authority to modify a sentence; it may do so "only when authorized by a statute or rule." *United States v. Puentes*, 803 F.3d 597, 606 (11th Cir. 2015). One of those statutes is 18 U.S.C. § 3582(c)(1)(A), which permits a court to reduce a term of imprisonment if the court determines that (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) the § 3553(a) sentencing factors weigh in favor of a reduction. *Id; see also United States v. Tinker*, 14 F.4th 1234, 1237 (11th Cir. 2021).

---

[2] Stinson has been incarcerated since the day of her arrest on September 23, 2021. Docs. 10, 11, 31.

The Sentencing Commission's applicable policy statement, set forth in USSG §1B1.13, defines "extraordinary and compelling circumstances" for purposes of section 3582(c)(1)(A), and it is binding on the courts. *United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021). Under section 1B1.13, there are four circumstances under which "extraordinary and compelling reasons" may render a defendant eligible for a sentence reduction: (1) the defendant is suffering from a terminal illness or a medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," (2) advanced age plus length of term already served, (3) family circumstances that result in "[t]he death or incapacitation of the caregiver of the defendant's minor child" or "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner," and (4) a catch-all provision restricted to other reasons "as determined by the Director of the Bureau of Prisons" to be extraordinary and compelling. USSG §1B1.13, comment. (n.1 (A)–(D)); *see Bryant*, 996 F.3d at 1248.

A court may not reduce a sentence based on a motion for compassionate release unless a reduction would be consistent with section 1B1.13. *Bryant*, 996 F.3d at 1248. Accordingly, the catch-all provision does not grant a court the discretion "to develop 'other reasons' that might justify a reduction in a defendant's sentence." *Id.* That provision is operative only if the BOP has determined that a reason "outside those explicitly delineated by the Commission [is] extraordinary and compelling." *Id.* at 1265.

If the court finds that an extraordinary and compelling reason exists, it still may not reduce the defendant's term of imprisonment under section 3582(c)(1)(A) unless it also finds that the defendant's release would not endanger the community and that the factors listed in 18 U.S.C. § 3553(a) favor compassionate release. *Tinker*, 14 F.4th at 1237. If the defendant fails to establish any of the three requirements, the court is not required to analyze the other requirements and cannot grant relief. *See United States v. Giron*, 15 F.4th 1343, 1348 (11th Cir. 2021).

The defendant, as movant, bears the burden of establishing entitlement to relief under section 3582. *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014) (addressing a motion for reduction of sentence under 18 U.S.C. § 3582(c)(2)). The defendant may move for compassionate release after "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See United States v. Harris*, 989 F.3d 908, 909–10 (11th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). The exhaustion requirement is "mandatory, in the sense that a court must enforce the rule if a party properly raises it." *Harris*, 989 F.3d at 911 (internal quotation marks omitted).

### A.    **BOP's Response to the COVID-19 Pandemic**

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years,

and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to Stinson. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the Stinson's motion.

### B.    BOP's Action Plan

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. Currently, all 97 of BOP's facilities are designated "Level 1", requiring minimal modifications. *Id.* (last accessed March 28, 2023).    Details of level-specific modifications                    are                    available                    at https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[3] This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the

---

[3]    This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also United States v. Pribyl*, No. 20-11848, 2022 WL 424874, *2 (11th Cir. Feb. 11, 2022) (unpublished) (the CARES Act does not give the "judiciary any authority to grant home confinement to a prisoner.")

total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All these strenuous efforts have been fruitful, now abetted by widespread vaccination (discussed below). It is notable that the rate of deaths in federal prisons has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.[4] Further, the incidence of positive cases in all BOP institutions has been sharply declining for months, with nearly all institutions currently reporting no cases or case tallies in the single digits.

## C.   Vaccinations

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure

---

[4]   According to the U.S. Census Bureau, the estimated resident adult population of the United States (age 18 and over) on July 1, 2019, was 255,200,373. *See* https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-detail.html. As of March 27, 2023, there have been approximately 1,122,084 adult deaths in the United States from COVID-19. *See* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (there have been fewer than 1600 deaths of persons under age 18, *see* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge, and we subtract that sum from the national total). According to BOP, the average population of BOP-managed institutions and community-based facilities in March 2020 was 157,756. As of the date of this filing, there have been 314 COVID-related deaths in those facilities. In asserting that the BOP experience has been relatively worse than the national experience, defendants have cited studies from much earlier time periods in the pandemic, since which time the national mortality numbers steadily and sadly increased at a more dramatic rate.

that BOP received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

The BOP has offered a vaccine—including a booster—to inmates in BOP-managed institutions, apart from some newly-admitted inmates. BOP has administered a total of 388,279 doses to inmates and staff. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available.

At FCI Tallahassee, where Stinson is held, BOP has fully vaccinated 100 staff members, and 1216 inmates (which does not account for those additional inmates who declined vaccination).

The clinical guidance provided to BOP health services professionals is available at   https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

8

### III.   COVID-19 AND COMPASSIONATE RELEASE

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit Court of Appeals recognized that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Merrill*, 847 F. App'x 675, 676–77 (11th Cir. 2021) (unpublished) (listing cases that held COVID-19 is not an extraordinary and compelling reason for compassionate release).

The government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" USSG §1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, No. 15-491, 2020 WL 3969778, at *5–6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at

least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quotation omitted)); *see also United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (affirming denial of compassionate release and observing that "the district court properly considered the CDC guidance that was in effect at the time . . . . Relying on official guidelines from the CDC is a common practice in assessing compassionate-release motions.").

The CDC's list of risk factors was most recently updated on February 10, 2023. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Moderate to severe asthma is on the list of conditions that "can make you more likely to get severely ill from COVID-19." District courts have routinely denied motions for compassionate release based on allegations of asthma. *See United States v. Jones*, 17 F.4th 371 (2d Cir. 2021) (district court did not abuse its discretion in denying relief where the defendant's asthma was mild, and there were few cases at his facility).

## IV. STINSON'S COMPASSIONATE RELEASE MOTION

### A. Exhaustion

Stinson has not exhausted her administrative remedies within the BOP. Stinson alleged in her motion that she submitted a request for compassionate release to the Warden on January 20, 2023. Doc. 77 at 3. The BOP, however, does not have any

10

record in its database of Stinson submitting any requests. The undersigned counsel inquired with the BOP for a copy of Stinson's alleged request and was advised on March 2, 2023, and again on March 27, 2023, that there is no record of Stinson submitting any request for compassionate release in its database. *See* Exhibits B and C. Moreover, according to Stinson's Unit Manager, Stinson has not filed a request for compassionate release with the warden or otherwise sought any administrative remedies for any reason while incarcerated at FCI Tallahassee. Because she has failed to exhaust her administrative remedies, her motion may be denied on that basis alone. *See Harris*, 989 F.3d at 911.

### B.     Extraordinary and compelling circumstances

In any event, Stinson's request for a sentence reduction should be denied because she has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG §1B1.13, comment. n.1(A). Here, Stinson requests a reduction of her sentence because she "is suffering from severe asthma[,] a respiratory disease[,] that without proper treatment and preventive measures can be very fatal." Doc. 77 at 5. Section

1B1.13 permits a reduction of a defendant's sentence based on the defendant's medical condition only when:

> (A) Medical Condition of the Defendant.
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG §1B1.13, comment. (n.1(A)–(D)).

Stinson asserts that she suffers from "severe asthma and has her whole life." [5] Severe asthma is identified by the CDC as a risk factor. However, the BOP records do not reflect the severity of Stinson's asthma. The records indicate Stinson is diagnosed with asthma and is currently prescribed an inhaler. *See* Exhibit D at 1, 54. According to Stinson's BOP health records, she last visited health services at FCI Tallahassee on

---

[5] According to the PSR, Stinson has lived with and been treated for asthma since adulthood. PSR ¶ 49. Her parents told U.S. Probation Officers Stinson was first diagnosed with asthma during college. *Id.* ¶ 50.

February 2, 2023, when she requested a "sick call"[6] and to be seen by a doctor. *Id*. at 1. On that date, a doctor examined Stinson and noted that she complained of chest and throat tightness, but it had improved with tea and hot fluids. *Id*. The doctor noted that although Stinson's asthma needs better control, Stinson's respiratory system did not present with increased work of breathing and her lungs were clear. *Id* at 1-2. As a result of the doctor's examination, the doctor increased the dosage of Stinson's prescribed Mometasone Furate inhaler to treat her asthma and ordered she use the medication two times per day for 180 days. *Id*.

Additionally, Stinson alleges that she has frequented health services at FCI Tallahassee "a number of times in the effort to get proper medical treatment for her asthma but is being denied proper medications, breathing treatments, and outside pulmonary appointments that she desperately needs." Doc. 77 at 17. According to Stinson's medical records, however, Stinson has not requested to see the doctor again for any issues related to her health care since February 2, 2023. The medical records also do not reflect any denial of medications or treatment or reflect with Stinson last suffered an asthma attack. To the contrary, the records reflect that Stinson has been seen and assessed by a medical doctor on multiple occasions and as demonstrated by her last visit, the doctor increased her medication based on Stinson's medical examination. Exhibit D at 1–2. In fact, a review of Stinson's medical records show that her asthma

---

[6] After speaking with legal counsel for BOP, the undersigned was advised an inmate may put in a "sick call" request to see the doctor at the facility.

prescription has been modified as needed since she first entered BOP custody. *See generally* Exhibit D.

Although Stinson may be more likely to face severe illness if she contracts COVID-19, she has also been vaccinated. According to Stinson's medical records, Stinson received the Moderna vaccine prior to being arrested in this case. *See* Exhibit D at 58. Moreover, the BOP offered Stinson a booster vaccination on July 14, 2022, which she refused. Exhibit D at 58, 101.

As a result, Stinson's motion for compassionate release should be denied. As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG §1B1.13 app. note 1(A)(ii). The government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision. That circumstance now does not exist in this case. Stinson has received a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was approximately 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities

14

associated with high risk of severe COVID-19. *See* FDA Decision Memorandum, Moderna - Dec. 18, 2020, https://www.fda.gov/media/144673/download.

Indeed, FCI Tallahassee has capacity to address COVID-19 cases. The institution currently houses 844 inmates. *See* FCI Tallahassee https://www.bop.gov/locations/institutions/tal/ (last accessed on March 27, 2023). At present, there is **one** inmate with a confirmed active case of coronavirus, who is isolated while they are treated/recover. [7] *See* BOP COVID-19 Statistics https://www.bop.gov/coronavirus/covid19_statistics.html (last accessed on March 27, 2023). The facility employs a team of medical professionals and provides round-the-clock medical care. The facility is equipped to provide medical isolation when required. By virtue of being in the BOP's custody, Stinson is in the presence of medical professionals at all times. In the unlikely event that Stinson becomes infected with COVID-19, she will be quarantined, monitored, and receive necessary medical treatment, wholly consistent with the CDC's guidelines. Stinson has not made a factual record that his needs will not be met while detained.

At the present time, it is apparent that, but for the COVID-19 pandemic, Stinson would present no basis for compassionate release. Her medical ailments appear to be controlled and do not present any impediment to her ability to provide self-care in the institution. This Court must consider all pertinent circumstances, including the §

---

[7] According to the BOP, there are 340 current inmates at FCI Tallahassee who previously tested positive and have recovered. https://www.bop.gov/coronavirus/ (last accessed March 27, 2023).

3553(a) factors, and possible danger to the community. Presently, Stinson's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19 and would also act to treat any inmate who does contract COVID-19. If Stinson wishes to challenge the conditions of her confinement, she can do so by filing a motion pursuant to 28 U.S.C. § 2241 in the district of her confinement.

**C.    Danger to the community**

Even if this Court finds that Stinson has established extraordinary and compelling circumstances within the meaning of section 1B1.13, it still should not grant Stinson a reduction of his sentence because she remains a danger to the community. As outlined above, the nature and circumstances of the offense show that Stinson was unrelenting in her efforts to have Victim 1 murdered. This is not an instance of a poor decision in the heat of the moment. For 10 weeks, Stinson consistently took steps to hire a third party to kill another human being. PSR ¶¶ 9-15. Stinson was unfazed by the delay of the purported hitmen to act on her requests and persistently sought to have Victim 1 killed. *Id*. Undeterred, Stinson doubled down and offered bonus money to "get [the] job done." PSR ¶11. Stinson had no idea that The Website she had contracted with to kill Victim 1 was essentially a scam—taking her money with no real plan to execute Victim 1. To the contrary, Stinson truly believed The Website's advertisements as being the dark web's "#1 hitmen service"—so much so that she placed multiple orders and paid over $12,000 to fulfill her murderous plot.

16

Moreover, Stinson's conduct demonstrates that she intentionally and strategically engaged in a course of conduct designed to effectuate the real-life killing of Victim 1 while Stinson attempted to insulate herself from culpability. Stinson intentionally sought to conceal her criminal acts by using the dark web and cryptocurrency to remain anonymous. Stinson even went as far to establish an alibi by traveling to Hawaii during the time frame she had requested that the murder take place. The offense conduct demonstrates Stinson's continued dangerousness.

The FBI arrested Stinson pursuant to a criminal complaint for murder-for-hire, in violation of 18 U.S.C. § 1958, and solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373. Doc. 1. At her initial appearance, the court denied Stinson's request to be released on bond. Docs. 6, 10. The court found that there were no conditions or combination of conditions that would reasonably assure the safety of the community. Doc. 18 at 4. Specifically, the court reasoned that Stinson had engaged in "substantial and sustained efforts to have the victim murdered despite all that the Defendant would lose if she were caught demonstrates the magnitude of the harm—including the possible death of the victim." *Id*. at 4. The court noted that this behavior coupled with Stinson's "sufficient financial resources to flee if she were so inclined" required her detention pending the resolution of her case. *Id*. at 4.

D.    Factors in 18 U.S.C. § 3553(a)[8]

Although the court need not analyze the section 3553(a) factors if the court finds no extraordinary or compelling reasons or that the Stinson is a danger to the community, a review of section 3553(a) factors also weighs against Stinson's release. *See United States v. Giron*, 15 F.4th 1343, 1347–48 (11th Cir. 2021).

**1.**  *Nature and Circumstances of the Offense*

Stinson demonstrated a callous disregard for human life when she went on a crusade to hire a hitman to kill her ex-boyfriend's wife. For months, Stinson plotted and actively tried to facilitate the murder of Victim 1. PSR ¶¶ 9-15. It is by pure chance that Stinson chose to use The Website, which later turned out to be a financial scam, to effectuate her plot to kill. *Id*. While The Website's hitman services were fake, Stinson's plan and desire to have Victim 1 kill were not. Stinson's intent is demonstrated in her repeated "orders" and payments to The Website, communication with The Website administrators and purported hitmen, and in her recorded conversation to an undercover FBI agent claiming to be the hitman. *Id*. ¶¶ 9-14. In fact, when the

---

[8]The factors in section 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

undercover agent asked Stinson if she was sure she wanted to go through with ordering the hit Stinson said "yes." *Id*. ¶ 14. In all these communications, Stinson expressed her honest and true desire to have Victim 1 killed and demonstrated the lengths at which she was willing to go to have the job done. The nature and circumstances of the offense dictate the need for Stinson's continued incarceration.

### 2. *History and Characteristics of the Defendant*

There is nothing in Stinson's background to explain her abhorrent criminal conduct in this case. She was reared in South Florida in a loving home by her mother and father, who have referred to Stinson as the "golden child." PSR ¶ 41. She has no prior criminal history. PSR ¶ 36. Stinson does not suffer from any mental health or substance abuse concerns. PSR ¶ 51. At the time of the offense, she was a certified public accountant and an active member of her church where she served as the chief financial officer. PSR ¶¶ 57–58. By all accounts, Stinson led a productive and successful life up until her arrest. These facts, however, do not mitigate the need for her continued incarceration. The fact that Stinson was willing to risk her freedom and livelihood to solicit the murder of an innocent person is beyond troubling.

### 3. *Need to Afford Adequate Deterrence and for the Protection of the Public Against the Defendant*

Stinson persistently sought kill Victim 1 while hiding behind the perceived anonymity of the dark web and cryptocurrency. Stinson showed a brazen disregard for human life. There is a need to afford adequate specific and general deterrence as well as a need to protect the public from Stinson for the full term of her incarceration.

Lastly, Stinson's premature release would infringe on her victim's right to reasonable protection provided under the Crime Victims' Rights Act, which specifies that crime victims have "[t]he right to be reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). The CVRA requires that the Court "ensure that the crime victim is afforded the rights" contained therein, which include "the right to reasonable, accurate, and timely notice of any public court proceeding" involving the defendant's release. 18 U.S.C. § 3771(a)(2), (b)(1).

THEREFORE, this Court should deny Stinson's motion for compassionate release.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail:        lisa.thelwell@usdoj.gov

**U.S. v. Stinson**                                    **Case No. 8:21-cr-343-SDM-AAS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 28, 2023, a true and correct copy of the

foregoing document and the notice of electronic filing were sent by United States

Mail to the following non-CM/ECF participant(s):

De Anna Marie Stinson
Reg. No. 66358-509
FCI Tallahassee
Federal Correctional Institution
P.O. Box 5000
Tallahassee, Florida 32314

*/s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6358
E-mail:       lisa.thelwell@usdoj.gov